787 F.2d 590
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
JOE E. HAMBLIN, Plaintiff-Appellant,
vs.
MARGARET HECKLER, SECRETARY HEALTH AND HUMAN SERVICES,
Defendant-Appellee.
 85-1184
 United States Court of Appeals, Sixth Circuit.
 3/3/86
 
 AFFIRMED
 W.D.Mich.
 On Appeal from the United States District Court for the Western District of Michigan
 Before: KEITH and GUY, Circuit Judges; and TAYLOR, District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff, Joe Hamblin, appeals from a district court decision affirming the decision of the Secretary of Health and Human Services (Secretary), denying his claim for disability insurance benefits. The issue raised before this court is whether the Secretary's decision is supported by substantial evidence.
 
 
 2
 Plaintiff filed his application of disability insurance benefits on December 27, 1982, alleging an onset date of October 11, 1978.[1] His application was initially denied, and he requested a hearing which was held on September 2, 1983. On October 21, 1983, the Administrative Law Judge (ALJ) found that plaintiff was not disabled since he retained the residual functional capacity to perform sedentary work. The Appeals Council affirmed, and plaintiff sought judicial review of the Secretary's decision in the United States District Court for the Western District of Michigan. The district court found that the Secretary's decision was supported by substantial evidence. As explained below, this court agrees with the district court and therefore affirms.
 
 
 3
 The relevant factual background is as follows. Plaintiff was born on February 26, 1936, making him 47 years old at the time of his administrative hearing. He was formally educated through the third or fourth grade and has relevant work experience as an arc welder. The ALJ found that this experience was medium to heavy, semi-skilled work, with no transferable skills. Plaintiff has not worked since October 11, 1978, when he injured his knee while working.
 
 
 4
 Plaintiff claims that he is unable to work due to a knee impairment, a severe back impairment, diabetes, and a stomach disorder. He testified that he cannot sit or stand for more than fifteen minutes at a time, and can only walk about a block with the assistance of a cane. Sometimes when he walks his knee buckles under him. His stomach sometimes aches, and he takes Maalox to alleviate the stomach pain.
 
 
 5
 The medical records indicate that plaintiff injured his right knee in October, 1978. In January, 1979, surgery was performed and the lateral cartilage was removed. At that time, it was also noted that he suffered from severe chondromalacia in the right knee. By November, 1982, plaintiff's treating physician, Dr. Burdick, was unable to note any obvious deformity in the right knee, although there was some mild crepitation. Otherwise his knee was essentially painless and had a full range of motion. In a January, 1983, report, Dr. Burdick noted that plaintiff was complaining of right knee pain; however, further surgery was not anticipated.
 
 
 6
 With respect to plaintiff's back problems, he first saw Dr. Berglund in 1981 complaining of lower back pain. X-rays were taken, revealing moderate hypertrophic spurring, with no evidence of acute injury. On November 24, 1981, Dr. Berglund prescribed a lumbar corset and twice a week therapy, and told plaintiff that he could go back to work. Plaintiff told Dr. Berglund that he was seeing Dr. Burdick about his knee problems, and that Dr. Burdick would not let him go back to work. Plaintiff never returned for another visit to Dr. Berglund, although requested to do so.
 
 
 7
 In a November, 1982 report by Dr. Burdick, he noted that plaintiff was complaining of almost continuous back pain. Examination of the spine revealed it to be straight, with no deformities. There was also no tenderness in the spine or signs of muscle spasms. A computerized tomography of the lumbar spine revealed an irregular disc at L3-4, an old calcified disc at L5-S1, and a herniated disc to the right of midline, at L5-S1. The specific cause of plaintiff's complaints could not be ascertained due to the multiple abnormalities. Subsequently, Dr. Burdick diagnosed severe degenerative disc disease, but advised against surgery. He urged plaintiff to learn to live with his back problems and not to 'sit around and overly concern himself with his multiplicity of complaints.' The doctor added that plaintiff's prognosis is poor.
 
 
 8
 In a letter to plaintiff's attorney, Dr. Burdick explained that:
 
 
 9
 As of his last visit to my office on the 1st of July I did not feel that he was able to work in anything, except sit-down type of work. It was also my understanding that the patient is basically illiterate and is not suited for retraining or any type of clerical work and that sit-down physical labor is virtually not available. He cannot return to his usually heavy physical labor at the time I last saw him on the 1st of July, nor do I feel he is able to at the time of this letter [August 29, 1983].
 
 
 10
 Plaintiff also claims that he is disabled due to a gastriculcer and diabetes. In November, 1972, he was diagnosed as having a large gastric ulcer and was placed on a regulated diet and medication. By the time he was discharged from the hospital his symptoms had subsided. Plaintiff has had diabetes mellitus since 1980, which is controlled through medication.
 
 
 11
 Relying upon the Medical-Vocational Guidelines (grids), the ALJ concluded that plaintiff is not disabled. Under 20 C.F.R., Part 404, Subpart P, Appendix 2, Table No. 1, Rule 201.19, an individual with plaintiff's characteristics--younger individual (age 45-49), limited or less education, skilled or semi-skilled work experience, with no transferable skills--is not disabled.
 
 
 12
 Plaintiff first argues that the ALJ improperly applied the grid. Specifically, he contends that the ALJ incorrectly classified his education as 'limited or less,' when, in fact, his education classification should be 'illiterate.' If plaintiff's educational status is classified as illiterate, Rule 201.17 would direct a finding of disabled.
 
 
 13
 With respect to educational classifications, 20 C.F.R. Sec. 404.1564 states:
 
 
 14
 (a) General. 'Education' is primarily used to mean formal schooling or other training which contributes to your ability to meet vocational requirements, for example, reasoning ability, communication skills, and arithmetical ability. However, if you do not have formal schooling, this does not necessarily mean that you are uneducated or lack these abilities. Past work experience and the kinds of responsibilities you had when you were working may show that you have intellectual abilities, although you may have little formal education.
 
 
 15
 Subsection (b) goes on to state: '[T]he numerical grade level that you completed in school may not represent your actual educational abilities. These may be higher or lower.' 'Illiterate' is defined under the Regulations as:
 
 
 16
 [T]he inability to read or write. We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name. Generally, an illiterate person has had little or no formal education.
 
 
 17
 20 C.F.R. Sec. 404.1564(b)(1). A 'limited or less' classification under the grid would consist of either a 'marginal education' classification, or a 'limited education' classification. These classifications are defined as follows:
 
 
 18
 (2) Marginal education. Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs. We generally consider that formal schooling at a 6th grade level or less is a marginal education.
 
 
 19
 (3) Limited education. Limited education means ability in reasoning, arithmetic, and language skills, but not enough to allow a person with these educational qualifications to do most of the more complex job duties needed in semi-skilled or skilled jobs. We generally consider that a 7th grade through the 11th grade level of formal education is a limited education.
 
 
 20
 20 C.F.R. Sec. 404.1564(b)(2) and (b)(3). With these definitions in mind, this court must determine whether substantial evidence supports the ALJ's finding that plaintiff has a limited or less education, but is not illiterate.
 
 
 21
 Plaintiff supports his contention as to illiteracy by pointing out that since he only completed three to four years of formal education, and his reading abilities, as evaluated by the Western Michigan University Vocational Center, are at about a second grade level, he should be classified 'illiterate.' However, as the Regulations explain, the years of formal education alone are not determinative of one's education status. There is evidence in the record supporting the ALJ's conclusion that plaintiff has at least a 'marginal education.' For example, he worked for more than fifteen years as an arc welder, a semiskilled job, and testified that he was able to learn the requirements of his job in a matter of weeks. This admission tends to support the conclusion that his language and communication skills are superior to those which would normally be attributed to a person with a third grade education. Moreover, plaintiff's responses to questions posed at the administrative hearing indicate that his comprehension and communication skills are good. Finally, in a reading therapy report, the therapist comments that plaintiff made a 'tremendous achievement for one semester' by learning to read at a second grade level. Thus, substantial evidence supports the Secretary's finding that Rule 201.19 applies because plaintiff's actual educational level was at least 'marginal' under the Regulations.
 
 
 22
 Plaintiff next contends that his back condition meets the requirements of the listings of impairments, 20 C.F.R. Subpart P, Appendix 1, 1.05(C) (1984), and that the ALJ's finding to the contrary is not supported by substantial evidence. In order to meet 1.05(C) of the listings, a claimant must establish:
 
 
 23
 C. Other vertebrogenic disorders (e.g., herniated nucleus pulposas, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months. With both 1 and 2:
 
 
 24
 1. Pain, muscle spasm, and significant limitation of motion in the spine; and
 
 
 25
 2. Appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.
 
 
 26
 Plaintiff points to a November, 1982, report of Dr. Burdick, where the doctor indicated that he had a probable herniated nucleus pulposa with persistent radiculopathy. The court notes, however, that in that same report, Dr. Burdick reported that '[e]xamination of the spine reveals it is straight, with no deformity. There is no spine tenderness or paravertebral spasm.' Since muscle spasms are required under the listings, this report of Dr. Burdick is not entirely supportive of plaintiff's position. Moreover, the reports of several other examining physicians bolster the ALJ's conclusion. In November, 1981, Dr. Ulmer reported that plaintiff had normal lumbar spine motion, and he failed to find nerve root abnormalities. Also in November, 1981, Dr. Berglund concluded that plaintiff's back ailments should not preclude him from going back to work. In the most recent report in the record, Dr. Burdick agreed that plaintiff could handle sit-down type work if it were available. Based on this evidence in the record, we conclude that the ALJ's finding that plaintiff did not meet the impairment listed at 1.05(C) is supported by substantial evidence.
 
 
 27
 Finally, plaintiff contends the ALJ failed to consider all of his ailments in combination and, when considered in combination, he is disabled. According to plaintiff, his impairments include obesity, diabetes, back pain, and the residual effects of the cartilage removal from his knee.
 
 
 28
 With respect to plaintiff's obesity, he is six feet tall and weighed approximately 257 pounds at the time of the hearing. Dr. Burdick, his treating physician, frequently advised him to lose weight and become more active. Since nothing in the record indicates that plaintiff's obesity is not a remediable condition, and since, according to Dr. Burdick, if plaintiff did lose weight it would improve his overall physical condition, the court accords plaintiff's obesity less weight than it would a nonremediable condition. Cf. Wever v. Harris, 640 F.2d 177, 178 (8th Cir. 1981).
 
 
 29
 The record indicates that both plaintiff's diabetes and stomach problems are now controlled by medication and, therefore, are not significant impairments to his ability to work. With respect to plaintiff's back and knee problems, as the ALJ specifically noted, they are severe impairments; however, not so severe that they would preclude him from performing sedentary work. The record indicates that Dr. Burdick was aware of plaintiff's multiple impairments, but nonetheless considered him fit for sit-down type work. He specifically warned plaintiff not to 'sit around and overly concern himself with his multiplicity of complaints.' Given all of the evidence in the record, and in particular Dr. Burdick's opinion as to the cumulative effect of plaintiff's impairments, this court finds that the ALJ was supported by substantial evidence in his assessment of the combined effect of plaintiff's impairments.
 
 
 30
 Accordingly, the decision of the district court is affirmed.
 
 
 
 *
 Honorable Anna Diggs-Taylor, United States District Court, Eastern District of Michigan, sitting by designation
 
 
 [1]
 In a previous application, dated August 20, 1979, plaintiff alleged the same onset date: October 11, 1978. His previous application was denied at the administrative level, and the decision was affirmed by the district court on January 27, 1982. The current application was filed on December 27, 1982, one month before plaintiff's previous application was decided. Given the final decision of the Secretary on his first application, plaintiff cannot allege an onset date of October 11, 1978. At best, plaintiff can allege an onset date on or after the date of the final decision of the Secretary on his previous application (the date is not indicated in the current record)